# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
October 2, 2012 Session

## STATE OF TENNESSEE v. JASON ALLEN COBB

**Appeal from the Circuit Court for Hardeman County**
**No. CC 2010-CR-146     J. Weber McCraw, Judge**

---

**No. W2011-02437-CCA-R3-CD  - Filed March 26, 2013**

---

A Hardeman County jury convicted appellant, Jason Allen Cobb, of second degree murder. The trial court sentenced him to twenty-three years in the Tennessee Department of Correction.  On appeal, appellant contends that (1) the trial court erred in admitting improper character evidence; (2) a witness's false testimony violated his right to a fair trial; (3) the State engaged in prosecutorial misconduct; (4) the evidence was insufficient to support his conviction; and (5) the trial court erred in ordering him to serve his sentence in this case consecutively to his sentence in another case.  Upon review of the record, the parties' briefs, and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Gary F. Antrican, District Public Defender; and Shana Johnson and Parker O. Dixon, Assistant District Public Defenders, Somerville, Tennessee, for the appellant, Jason Allen Cobb.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; D. Michael Dunavant; District Attorney General; and Joe Van Dyke and Katie Walsh, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History and Facts

A Hardeman County Grand jury indicted appellant, who was an inmate at the Hardeman County Correctional Facility, for second degree murder based on the death of

another inmate in April 2010.  The trial court presided over a jury trial on May 17-18, 2011, at which the parties presented the following evidence:

Correctional Officer Larry Cheairs testified that his April 19, 2010 shift at Hardeman County Correctional Facility began at 7:00 p.m. and ended at 7:00 a.m.  He was responsible for three of the prison pods and made rounds about eight times a night.  Officer Cheairs described his duties as counting the inmates and monitoring the inmates for any illegal activities.  He identified appellant in the courtroom and stated that he had known appellant's cellmate, Ricky Gardner, the deceased victim.  He testified that the last time he saw the victim alive was around 2:00 a.m. on April 20, 2010.  The victim was pacing back and forth inside the cell, and appellant appeared to be asleep on his bunk.  At the next check, which was between 4:30 a.m. and 5:00 a.m., Officer Cheairs stated that appellant and the victim were in their bunks.  Officer Cheairs testified that between cell checks, he did not see or hear anything to alert him to any disturbance in appellant's cell.

On cross-examination, Officer Cheairs stated that on April 19, 2010, his count of twenty cells took "about two or three minutes."  He explained that his count consisted of his walking by and flashing his flashlight into the cell.  When informed that the video recorded his count at one minute and twenty-two seconds, Officer Cheairs replied, "Yeah, it's possible[,] but I don't think that I would walk through that fast."  When asked if he would have had much time to observe people moving around, Officer Cheairs replied, "When you're looking in their face, you would."  He also said, "[The victim] was coming to the door when I walked through."  Officer Cheairs also testified that he did not remember seeing a television in the cell.  He further stated that he was no longer employed at the Hardeman County Correctional Facility.

On redirect examination, Officer Cheairs explained that the control booth kept the time log of his cell inspections and stated, "I just did my check."  He again confirmed that the victim was alive when he checked on him at 2:00 a.m.  On recross-examination, Officer Cheairs admitted that the control booth video kept the time and would have to be relied upon as the correct time.

The trial court accepted Dr. Lisa Funte, a medical examiner for the Shelby County Regional Forensic Center in Memphis, as an expert witness in the field of pathology.  Dr. Funte testified that she conducted the autopsy of the victim.  Dr. Funte identified the investigative report, autopsy report, toxicology report, and diagrams and photographs from the autopsy.  They were admitted into evidence. She outlined her office's procedure for receiving a body, conducting an external examination, photographing evidence, and, if needed, collecting evidence.  Dr. Funte found external and internal injuries to the victim's neck area consisting of red discoloration and hemorrhage in muscles in the front of the neck

and in the deep soft tissue of the neck. She also found petechial hemorrhages, which she described as "a bunch of little red hemorrhages" in the membrane that covers the eye, called the conjunctiva. In addition, the fingernail on the victim's right index finger had been pulled back from the nail bed, and there was blood underneath. Dr. Funte testified that based on her investigation and observation, she found the cause of death to be manual strangulation and the manner of death to be a homicide.

On cross-examination, Dr. Funte noted that the victim's body was in an early state of decomposition, which could be attributed to the victim's being dead "a day or two," being sick at the time of his death, or being in a warm room. She testified that the victim's injuries appeared to have been inflicted "from behind the individual with an arm bar, a choke hold[,] or something like that," which would be more consistent with her findings than a frontal assault with the hands. On redirect examination, Dr. Funte testified that her examination of the victim's body revealed no evidence of a struggle with another individual, and "[t]he only other injury on him was that broken [finger]nail."

Terrence Olridge, an employee at the Hardeman County Correctional Facility, testified that April 19, 2010,[1] was his first day on the job at the correctional facility. He stated his shift began at 7:00 a.m. and ended at 7:00 p.m. Prior to his first official day, he was given about a week of floor training, which was "[p]retty much regular security checks, pat downs, . . . doing disciplinaries, and things of that matter." He was assigned to appellant's unit and remembered appellant and the victim. Officer Olridge testified that when he arrived for duty that morning, he performed security checks that consisted of walking around the pods looking for anything out of the ordinary such as covered windows, clotheslines, or assaults in progress. He stated that he was required to touch "a little silver place on the wall" to confirm his check. Officer Olridge explained that his next duty was a cell check during which he primarily looked for contraband such as weapons or cellular telephones. He testified that he usually conducted one contraband search per day, and his shift sergeant made the cell designation. He further testified that on April 19, 2010, he was assigned cell J-F 209, which was the cell of appellant and the victim.

Officer Olridge stated that he conducted the cell check of appellant and the victim around "nine, maybe 9:20, 9:30" a.m. He stated that during the cell check, an officer removed the inmates from the cell, then an officer searched "the bunks, the TVs, the clothing, the gray tubs they [had]." He recalled asking appellant and the victim to leave the cell and stated:

---

[1] While Officer Olridge testified that his first day was April 19, 2010, we glean from the record that this must have been a misstatement, and his first day was actually April 20, 2010.

Well, I asked Cobb to step out, which he did, and he removed the stuff from the top window as he stepped out of the cell. Then I went in the cell, then I asked - I verbally told Mr. Cobb - his cellie, Gardner, to step out and he wasn't moving so I asked Mr. Cobb what was going on with that cellie and he told me he was asleep.

Officer Olridge testified that the victim did not respond when asked to leave, and he proceeded to conduct the search with the victim in the cell, which Officer Olridge admitted was not proper protocol. However, this was his first day on the job, and he was not aware of the rule. He recalled seeing appellant's "belongings" packed up and asked appellant where he was going. Appellant replied that he was going into protective custody. Officer Olridge stated that appellant never made any statements about any prior incidents with his cellmate occurring the night before. He stated that he did not hear any beating or banging, see any flashing lights, or notice anyone trying to get his attention on his rounds of the pod that morning. Upon learning of appellant's request for protective custody, Officer Olridge asked appellant to step back in the cell, and he proceeded to notify his unit manager of appellant's request. Officer Olridge further testified that he completed his inmate count at approximately 10:40 a.m. by accompanying Ellen Futrell and Case Manager Tenisha Douglas into appellant's cell and observing the same unchanged position of the victim.

On cross-examination, Officer Olridge admitted that he did not arrive for work until 7:00 a.m. and would not have witnessed any events of the previous early morning hours. Until being shown his statement to the Internal Affairs Investigator, Officer Olridge could not recall tapping the victim trying to awaken him. Officer Olridge stated he remembered appellant's telling him that the victim was asleep. He related that this occurred at about 9:00 a.m. Officer Olridge stated he did not hear anyone say anything about the victim's going to breakfast that morning. Officer Olridge testified that at about 9:35 a.m., he went to his unit manager, Officer Robinson, and informed her of appellant's request for protective services. Officer Olridge recalled that Officer Robinson, Ellen Futrell, and Ms. Douglas were in the cell with him when they discovered the deceased victim.

On redirect examination, Officer Olridge testified that he remembered seeing the victim's pillow, but he remembered that the victim's blanket was "[p]robably midways." He stated that appellant told him that he was going into protective custody, not that he was going to ask to go into protective custody.

Ellen Futrell, a fourteen-year employee at the Hardeman County Correctional Facility, explained that she supervised the correctional officers and the inmates. Officer Futrell testified that she was conducting a "security [walkthrough] with the unit team" when she noticed that cardboard had been placed over appellant's cell window, which was a violation

-4-

of security rules. She verbally directed the victim to remove the cardboard from the window, but he did not respond. After getting no response, Officer Futrell stated:

> I walked over and I said, "I'm fixing to get this cardboard out of the window. Don't reach up here and hit me," you know, because I thought he was asleep, and that's what his cellie said, "Well, he's asleep." So I pulled the cardboard out of the window and he still hadn't moved[,] so that's when I tapped him.
>
> . . . .
>
> I tapped him again and Ms. Douglas, the case manager . . . was there, I turned around and I said, "This guy ain't moving." And at that time, she stepped into the cell[,] and I called a Code Four, which is medical.

Officer Futrell identified appellant as the victim's "cellie" who told her that the victim was asleep.

When asked about the placement of the blanket on the deceased victim, Officer Futrell recalled that "[I]t was over his head," but after considering the earlier security count, she stated that the blanket stopped near the victim's shoulders. Officer Futrell said that she had no knowledge of appellant's being transferred to protective custody and testified that the transfer had not passed through any official channels.

On cross-examination, Officer Futrell explained the function and procedure that correctional officers followed regarding the call buttons in every cell. When an inmate activates the call button, it alarms or "beeps" in the control room and will continually sound until someone answers the call. Officer Futrell explained that after the call is answered, a manual entry is made in the logbook but admitted that if a call is not answered and no logbook entry made, no record of the call would exist. Officer Futrell testified that it would "[p]robably take [her] a good ten to fifteen minutes" to walk and count inmates in twenty cells, and if someone conducted a count in one minute and twenty-two seconds, "[they] would] just be walking. [They] wouldn't see anything."

Officer Futrell denied giving a statement to investigators with Internal Affairs. She stated that she talked to "some guy," but she did not know his title or if he was an investigator with Internal Affairs. Defense counsel gave Officer Futrell a copy of her statement and asked if it was the statement that she gave to "[that] guy or Nickie Jordan with Internal Affairs." Officer Futrell answered that it was the statement that she had given. She acknowledged that her statement did not mention that appellant told her that the victim was asleep, but she maintained that appellant did, in fact, tell her that. She agreed that her

memory of the incident was more fresh at the time she gave her statement than at trial; however, she also denied that her memory was incorrect at the time of trial. Officer Futrell testified, on recross-examination, that she was not reprimanded or re-instructed on proper count procedures as a result of the victim's death.

Tenisha Douglas testified that she was employed as a case manager at the Hardeman County Correctional Facility. She stated that she dealt with clothing issues, reclassifications, and any personal issues that arose in the facility. On the date of this incident, her unit team was conducting a walkthrough, usually completed once a week, which consisted of making sure the cells were in facility compliance. Ms. Douglas explained that she was next door to the cell of the victim and appellant when she heard Officer Futrell call her name. Ms. Douglas related what she observed as she responded:

> Inmate Cobb was standing at the door. Ms. Futrell was standing over the body - the guy on the bottom bunk, and she was, like, "He ain't moving. He won't respond." And I - that's when I felt his pulse and "I said no. You should call the Code Four." And I was like - We called Ms. Robinson, which is the unit manager, and she said, "Y'all step out of the cell" and we stepped out of the cell along with Mr. Cobb until medical got there.

Ms. Douglas further testified that she believed that the victim's back was toward her when she approached him and that she placed her hand on his neck to feel his pulse. She did not notice anything odd about the victim's clothing. She stated, "[A]fter I didn't feel a pulse, I didn't pay attention. I just told them, you know, '[W]e need to get out of the cell,' or whatever." Regarding any conversation with appellant while they were standing outside the cell, Ms. Douglas testified that when they were in the cell, she heard appellant say, "'He's asleep - he's asleep,'" before she had touched the victim. She recalled that the doctor was at the facility that day and pronounced the victim dead at the scene.

On cross-examination, Ms. Douglas recalled entering the victim's cell "a little after ten because it was count time" and that the inmates were locked down for count time, which started at 10:15 a.m. She acknowledged being familiar with the cell of the victim and appellant because she had been there previously. However, she could not confirm the presence or absence of items in the cell because "[e]very inmate has different stuff in their cell . . . ." She recalled that Officer Futrell, Officer Olridge, Unit Manager Robinson, and Case Manager Leake were with her in the cell.

James Taylor testified that he was a former inmate at the Hardeman County Correctional Facility and that he was housed in the cell next to the victim and appellant in April of 2010. Mr. Taylor remembered appellant and identified him in the courtroom. He

recalled playing chess with the victim, an "older black gentleman," every day, sometimes twice a day, and denied ever having any problems with either appellant or the victim. Additionally, Mr. Taylor denied hearing yelling, banging, or anything odd on the night of the victim's death.

During cross-examination, Mr. Taylor described how officers conducted inmate counts. He stated, "They just walk around[,] count how many people [are] in a room[,] and keep moving." He further testified,

I'd say about the 9:30 count when we first get locked down[,] they'll come around and kind of look. After the 9:30 count they just walk in, fake like they [are] looking in the cell[,] and keep moving.

Mr. Taylor admitted he did not know appellant very well and characterized appellant as "kind of weird," not socializing with the other inmates.

Investigator Michelle Brush of the Hardeman County Correctional Facility testified that she was not on duty when the victim was found, but she arrived shortly thereafter. She identified and described surveillance video that showed the housing unit, cell doors, and any movement of inmates and staff around the unit. Investigator Brush outlined the operation and function of the inmates' intercom box in each cell. She explained that when an inmate activated the intercom button, an audible alert sounded, and a flashing light became visible on the control panel in the control booth. The officer who pressed the button to answer the call in the control booth would immediately hear communication from the inmate's cell. To close communication with the cell, the officer would press the reset button.

Investigator Brush further testified that she had no knowledge of appellant's asking for protective custody and explained that the facility provided protective custody when an inmate had "some kind of concern or whatever." Protective custody isolated inmates from the general prison population.

On cross-examination, Investigator Brush explained the operation of the inmate's intercom button as it is heard in the control booth, stating, "When [the officer] press[es] the button[,] the audio begins being heard, you press the button release. You can hear the audio until you then press the reset button." During the viewing of the surveillance video of appellant's pod, Investigator Brush explained the visible area and the actions of the officer on duty. She testified that the video showed an officer entering the pod camera view at 1:50:23 a.m. and exiting the pod at 1:51:53 a.m. She identified the officer in the video as Larry Cheairs.

During redirect examination, Investigator Brush testified from her video notes that she first observed appellant leave his cell at 9:26 a.m. when Officer Olridge entered to conduct a cell search. She stated that it was possible appellant left his cell earlier for breakfast in the dining hall. On recross-examination, Investigator Brush admitted that, at this point and without viewing another portion of the video and record, she could not testify whether he exited the cell for a meal or not.

Agent Joe England, a Special Agent with the Tennessee Department of Correction, Internal Affairs Division, testified that he investigated criminal or administrative cases involving inmates of the Tennessee Department of Correction. In April of 2010, he investigated the death of the victim at the Hardeman County Correctional Facility. Agent England identified appellant as the victim's former cellmate. After arriving at the scene of the incident, Agent England photographed and inspected the cell, its contents, and the decedent's body. He noted that the cell appeared to be in a normal state, having no signs of a fight or anything out of the ordinary. The only thing that seemed odd to him was the property of one of the inmates being prepacked and on the top bunk. In his examination of exhibit photographs, Agent England identified the intercom button on the wall in the cell and stated that the distance from any point in the cell to the intercom button was "no more than three [steps], depending on [one's] stride." He testified that he viewed the surveillance video at length and made notes regarding movements in and out of appellant's cell. Agent England noted that at 5:47 a.m., a person whom he believed to be appellant exited the cell and re-entered the cell at "[a]pproximately 5:53 a.m." Other than correctional officers later in the day, this was the only person he saw exit or enter the cell.

During cross-examination, Agent England testified that he contacted Warden Joe Easterling about the inmate count procedure violations, and the warden informed him that he had verbally reprimanded and talked with each correctional officer. On redirect examination, Agent England agreed that depending on the tone of voice or setting, an employee might not perceive a verbal talk as a reprimand. He also agreed that the implemented changes in procedures applied to everyone in the facility.

Cornelius Davis testified on behalf of appellant that he had served four and one-half years at the Hardeman County Correctional Facility. He was acquainted with the victim but only knew appellant by sight. He recalled the victim's death on April 19, 2010, and remembered hearing Ms. Futrell tell Ms. Robinson, the Unit Manager, that "she had seen Mr. Gardner go to breakfast." In response, Mr. Davis screamed through the door saying, "'Ms. Futrell, you are telling a story because I used to wake Mr. Gardner up for breakfast every morning.'" When asked if he knew something was wrong, Mr. Davis answered,

I didn't know nothing [sic] was wrong, you know what I'm saying, because I just knocked on the door - I just thought he didn't make it to breakfast or he already had went because I ain't seen him.

On cross-examination, Mr. Davis testified that he was housed in Cell 2010, which is next to the cell of appellant and the victim, and that he heard appellant scream the night of the victim's death, as he had on several previous occasions. He stated he did not hear a fight in progress or any "yelling at folks" that night. Mr. Davis also testified that if someone in the next cell had pushed the intercom button, he would have heard the officers answer.

On redirect examination, Mr. Davis agreed that if the intercom request was not answered, he would not have heard any voices. He explained that when an inmate activated the intercom button, it would sound until someone responded.

Appellant testified that he was serving ten years at the Hardeman County Correctional Facility for aggravated robbery and that he had three prior cellmates before the victim. He stated that his relationship with the victim was not good. Appellant further stated, "[the victim] used to make sexual advances, you know what I'm saying, towards me. He used to cuss me out, call me young and ignorant. I guess he was just old and senile. I don't know."

Appellant said the victim would offer him his commissary, which could include "food, items, clothing, anything, electronics, anything like that," but he never accepted any exchanges from the victim, stating, "No, sir. I'm not a homosexual or nothing like that." He testified that the victim's sexual advances were numerous and that he did not report it because he was embarrassed, did not want trouble with other inmates for reporting it, and did not want to get a "write-up." Appellant testified that on the evening of April 19, 2010, the victim approached him with his pants down for a sexual favor. Appellant stated that when he refused, the victim pulled up his pants, became aggressive, and "swung" at him. Appellant further stated that he grabbed the victim and "[took] him down." Further describing the incident, appellant testified,

Well, he swung at me - he swung at me with his right - with his right hand. I sort of like blocked it with my left hand and his body turned to the right so that's when I took my hand - my right arm around his neck and then I began putting him in the sleeper or choke hold or submission hold, you know what I'm talking about.

Appellant testified, "He kept on getting stronger and getting stronger like he was fixing to break down - break me up out of the hold so I brought him down to the ground in the same fashion of holding him." Appellant further testified that he asked the victim several

times if he was going to stop being aggressive. He said the victim "didn't respond to it, he just kept moving. Kept moving. It wasn't like he was trying to get out of it. He was trying to fight me back." Appellant stated he asked the victim "about four times" to stop fighting back, then "[the victim] quit putting up a struggle[,] and he just let go[,] and once he let go, I let go." Appellant recounted that he pushed the intercom button once or twice, heard "somebody mess with the intercom thing," and "flicked the lights on and off" trying to get the control booth officer's attention. He testified that as an officer was walking by, he knocked on the window and yelled that he had a problem but was unable to "tell the officer anything." Appellant stated,

> I was panicking at the time, you know what I'm talking about. After he left past me I just - looked around the cell for a moment and I prayed because I didn't know what to do. This man had passed out or whatnot, you know what I'm saying. I moved him - I moved him up to the bed because I didn't want him on the floor, you know what I'm talking about, if they do come in. I just put him on the bed and put his cover over him. They still didn't come back. After that, I just quit trying to ask for help because they wouldn't come, wouldn't respond.

He did not know at what time this occurred, only that it was still dark outside. He further testified, "I really didn't have any thoughts in my mind. I was just like this man needs some help, you know what I'm talking about, and I couldn't get it for him so[,] I just gave up basically."

Appellant stated that he went to breakfast and went about his normal business. He recalled the first officer's entering the cell and conducting a cell search. Later, Ms. Futrell and the others entered.

Appellant did not recall telling any officer that he was expecting to go into protective custody, but he admitted that before this incident, he had been speaking with a counselor about it. Appellant testified that when the victim charged him, he thought the victim was going to injure him, and he had to defend himself. He stated, "I didn't know what he was going to do. I guess you - it's safe to say that, it was a me or him situation." He recounted that the victim told him that he was incarcerated for rape, when, in fact, he was incarcerated for murder. Appellant thought that by doing so, the victim was "trying to intimidate [him]."

On cross-examination, appellant explained problems he had with two prior cellmates. He stated that his first cellmate "[came] to [him] about some affiliation about some gang," and he and the second cellmate got into "an altercation in the classroom[,] and [appellant] got moved to segregation." He admitted that he did not report the victim's sexual advances

-10-

because he was "trying to avoid write-ups" and that he only told someone after the victim was deceased. He testified that the victim struck him first on the shoulder, at which time appellant placed the victim in a "strangle hold" until the victim ceased resisting. Appellant further testified that he pushed the intercom button twice yelling for help and stated, "Nobody responded either time." When asked why he moved the victim from the floor and onto a bunk, appellant responded, "The problem was he was just laying [sic] on the floor. He wasn't - he was just - he was just in the way." Appellant testified that he did not try to get help any more and possibly went to sleep. He further testified that he went to breakfast and did not ask for anyone's help because "[the victim] usually don't [sic] even get up and go to breakfast. He usually gets somebody to wake him up."

On redirect examination, appellant testified that he was defending himself and did not mean to kill the victim. Appellant stated, "[The victim] died because he tried to make sexual advances, swinging at me, I thought I was - I thought if I let go I'd be overtaken by him or whatnot, and that was it. I thought he was unconscious or something, not breathing. I didn't know."

Benjamin Swenson testified that he served time between 2003 and 2010 for aggravated sexual battery. He met the victim at the South Central Correctional Facility, and they became friends through playing chess. He recounted an incident of the victim's repeatedly asking him for sexual favors. He stated that when he refused, the victim became argumentative and attacked him. Mr. Swenson testified that after "wrestling real rough," he relented, "[gave] him a hand job," and was allowed to leave the cell.

On cross-examination, Mr. Swenson denied giving the victim sexual favors for commissary credits and admitted making an assault report on the victim, stating, "I did use Ricky to get out of there but I was scared for my life from Ricky."

On redirect examination, Mr. Swenson agreed that he was placed in segregation before being transported out and admitted that he was afraid for his life. He identified a photograph of some of his injuries and explained that there were also injuries to his elbow, hands, ribs, and foot.

On recross-examination, Mr. Swenson admitted he and the victim were "in a pretty good wrestling match," that he was in prison for aggravated sexual battery, and that his victim was less than thirteen years of age.

Investigator James Nadolski testified that he was an Internal Affairs Investigator at the South Central Correctional Facility. He recalled investigating an incident in 2008 involving Mr. Swenson and the victim during which Mr. Swenson alleged that he was forced

to perform a sexual act on the victim. He identified photographs taken of Mr. Swenson after the incident, which showed scratch marks on his body. Investigator Nadolski testified that Mr. Swenson had slight bruising to his ribs and swelling to both ankles. He recalled Inmate Gardner admitting only that

> at some point in time during this chess game, [Mr.] Swenson got up or stood up in his presence and [the victim] stated that he put his hands on his shoulder to calm him down and had him sit back down and play the game, at which point [Mr.] Swenson kind of blew up at the game and that was the only physical contact that [the victim] would admit to.

Investigator Nadolski's physical examination of the victim revealed no marks on his body.

On cross-examination, Investigator Nadolski testified that he found the allegations made by Mr. Swenson to be unsubstantiated. On redirect examination, Investigator Nadolski clarified that he was unable to establish that an attack had occurred and stated, "If I was able to establish an attack, I would have charged [the victim] with assault or fighting." He testified that the victim's disciplinary record reflected that his last incident of fighting was in 2002, six years before Inmate Swenson's allegations. He also had an assault or fighting incident in 1997 and a sexual misconduct incident in 1991. Investigator Nadolski further related that his file showed the victim received infractions for threatening an employee in 1991, assault in 1988, and fighting in 1987.

After hearing the evidence, the jury convicted appellant of second degree murder. The trial court held a sentencing hearing on August 26, 2011. At the sentencing hearing, three of the victim's sisters testified about the effect the victim's death had on their family. Appellant's father also testified about appellant's character, prior conviction for aggravated robbery, and problems with other inmates while incarcerated.

After hearing the evidence at the sentencing hearing, the trial court found as a sentence enhancement factor that appellant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range and that appellant was incarcerated in a penal institution for a felony charge or a felony conviction at the time he committed the underlying felony.[2] The trial court did not find any mitigating factors. Regarding consecutive sentencing, the trial court found that appellant was a dangerous offender whose behavior indicated little or no regard for human life and that appellant had

---

[2] *See* Tenn. Code Ann. § 40-35-114(1), (13)(I) (2010).

no hesitation about committing a crime in which the risk to human life was high.[3] The court ordered that appellant serve a sentence of twenty-three years, at 100% release eligibility, consecutive to the sentence that he was serving.

## II. Analysis

Appellant argues that the trial court committed reversible error when it admitted improper character evidence, that false testimony violated his right to a fair trial, that the prosecution engaged in misconduct, that the evidence was insufficient to support his convictions, and that the trial court erred in sentencing him.

## A. Character Evidence

Appellant contends that the trial court erred when it allowed testimony regarding his prior bad acts. Moreover, he argues that the State "continually and prejudicially utilized inadmissible and inappropriate character evidence in cross-examination of [appellant's] witnesses, including [appellant]." Appellant acknowledges that he failed to raise this issue in his motion for new trial; however, he requests that this court consider the issue under plain error review. The State responds that the appellant has waived this issue because he failed to include it in his motion for new trial and amended motion for new trial and that the trial court properly admitted the evidence.

It is undisputed that appellant did not raise the issue of the trial court's admission of the allegedly improper character evidence in his motion for new trial or in his amended motion for new trial. "[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). "Ordinarily, issues raised for the first time on appeal are waived." *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (citing *State v. Burtis*, 664 S.W.2d 305, 310 (Tenn. Crim. App. 1983)). "However, the waiver provision does not apply when the issue, if found to be meritorious, would result in the dismissal of the prosecution against the accused." *State v. Scott G. Clevenger*, No. E2007-00298-CCA-R3-CD, 2008 WL 588862, at *3 (Tenn. Crim. App. Mar. 5, 2008) (citing *State v. Keel*, 882 S.W.2d. 410, 416 (Tenn. Crim. App. 1994)). Because this issue would not result in the dismissal of the prosecution of the accused, this court could certainly conclude that appellant's issue of whether the trial court admitted improper character evidence is waived. *See* Tenn. R. App. P. 3(e); Tenn. R. Crim. P. 33(b).

---

[3] *See id* § 40-35-115(b)(4) (2010).

Waiver notwithstanding,

> [w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

Tenn. R. App. P. 36(b). This discretionary consideration of waived issues is often referred to as "plain error" review. *See Grindstaff v. State*, 297 S.W.3d 208, 219 n.12 (Tenn. 2009). Our supreme court formally adopted this court's *Adkisson* test for reviewing claims of plain error:

> The Court of Criminal Appeals has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before a court will find plain error. *Id.* Complete consideration of all the factors is not necessary when clearly at least one of the factors cannot be established by the record.

Appellant complains that the trial court allowed the State to question him regarding his aggravated robbery conviction to show that appellant was "the violent one in the cell." He further asserts that the State made improper comments during closing arguments, including suggesting that appellant had made sexual advances toward the victim. In addition, appellant posits that the State attempted to cross-examine Mr. Swenson regarding "irrelevant and prejudicial character and propensity information," specifically that he performed sexual acts for commissary credits, in order to prejudice the jury against Mr. Swenson. Appellant states that he presented Mr. Swenson's testimony to corroborate his theory of self-defense and that "[t]he State's poisoning of the jury against Mr. Swenson was inappropriate and deprived [appellant] of the right to a fair and impartial trial and to call witnesses [on] his behalf." There is no evidence that appellant waived review of these issues for any tactical reason. Because the record clearly establishes what happened in the trial court regarding these issues, we move on to consider whether a clear and unequivocal rule of law was breached.

## 1. Impeachment of Appellant with Evidence of Prior Conviction
for Aggravated Robbery

Appellant first takes issue with the State's questioning him regarding his prior conviction for aggravated robbery. On cross-examination, after appellant had already brought up his conviction on direct examination, the State asked appellant if he had a conviction for aggravated robbery and if aggravated robbery was a violent offense.

The decision whether to admit evidence rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *See State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the act more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Once evidence satisfies the definition of relevance, it becomes admissible unless a rule excludes it." Tenn. R. Evid. 402, Advisory Comm'n Cmts.

Rule 609 of the Tennessee Rules of Evidence provides that under certain conditions, a witness's credibility can be attacked with evidence that the witness has been convicted of a crime. Such conditions are that the crime must be punishable by death or more than one year in prison or must have been a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). The Advisory Commission Comment makes clear that only felony convictions or misdemeanor convictions involving dishonesty or false statement "are competent for impeachment." Tenn. R. Evid. 609, Advisory Comm'n Cmt. "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release." Tenn. R. Evid. 609(b). Our courts have previously recognized that aggravated robbery is a crime of dishonesty. *See State v. Goad*, 692 S.W.2d 32, 37 (Tenn. Crim. App. 1985); *State v. Caruthers*, 676 S.W.2d 935, 941 (Tenn. 1984). Moreover, appellant's prior conviction for aggravated robbery is not similar to second degree murder. *See State v. Michael Bailey*, No, W2005-01815-CCA-R3-CD, 2007 WL 763212, at *3 (Tenn. Crim. App. Mar. 13, 2007) (citing *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994); *State v. McCary*, 922 S.W.2d 511, 514-15 (Tenn. 1996)) (noting that the risk of a jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime is greater when the defendant's prior bad acts are similar to the crime for which the defendant is standing trial). Pursuant to Rule 609 of the Tennessee Rules of Evidence, appellant's aggravated robbery conviction was admissible to attack his credibility.

However, our inquiry does not end there. The State went on to question appellant about whether the conviction involved violence. "Pursuant to Rule 609, evidence of a witness's prior conviction must be 'limited to the fact of a former conviction and of what crime, with the object only of affecting the credibility of the witness . . . .'" *State v. Eddie Elveton Robinson Gaston*, No. E2004-01450-CCA-R3CD, 2006 WL 74149, at *25 (Tenn. Crim. App. Jan. 13, 2006) (quoting *State v. Taylor*, 993 S.W.2d 33, 34 (Tenn.1999)). Thus, the State's line of questioning regarding the specifics of the offense may have been improper if Rule 609 were the only rule pertaining to its admissibility.

Appellant attempted to establish through his testimony that the victim was the initial aggressor and had a history of verbally abusing him and making sexual advances toward him. We note that defendants in criminal cases may offer evidence of the victim's character for violence. *See* Tenn. R. Evid. 404(a)(2). A defendant is "entitled to show the state of mind of the deceased so the jury could determine who was the true aggressor." *State v. Furlough*, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990) (citing *State v. Butler*, 626 S.W.2d 6 (Tenn. 1981)). However, if a defendant has placed the victim's character at issue, the State then may offer character evidence about the defendant to rebut the same. *See* Tenn. R. Evid. 404(a)(1). "Rebuttal evidence is 'any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting *Nease v. State*, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). Because appellant placed the victim's character for violence at issue, character evidence about appellant's character for violence was admissible to rebut the same. *See* Tenn. R. Evid. 404(a)(1).

Generally, evidence of character or a trait of character must be admitted at trial by testimony as to reputation or testimony in the form of an opinion. Tenn. R. Evid. 405(a). Appellant effectively placed his own character for violence at issue during his trial. Under the rule, the State could have rebutted appellant's evidence about the victim's character for violence by presenting a witness to testify about appellant's character for violence.

However, on cross-examination, the State asked appellant whether his conviction for aggravated robbery involved a weapon, inferring that it was a violent act. Appellant denied that he utilized a weapon in the aggravated robbery, whereupon trial counsel lodged an objection. The trial court held a bench conference. The State argued that it had a right to demonstrate that appellant had a violent history to rebut appellant's attempt to place "all of the aggression onto the victim." The trial court inquired about the relevance, and the State responded that it was trying to prove that appellant was the violent person in the prison cell. After further conference, the trial court ruled that the State could question appellant as to whether the aggravated robbery had "an element of violence to it" and instructed the State to then "move on" because the evidence was not pertinent to the case. When the State

resumed its questioning of appellant, it reworded the question and asked if the conviction was a violent offense. Before a discernible answer was obtained, the trial court again instructed the State to "move on."

Under the facts of this case, no clear and unequivocal law was breached. Thus, appellant is not entitled to plain error review. Moreover, because appellant neither confirmed nor denied that violence was an element of his conviction, we conclude that consideration of the error is not "necessary to do substantial justice." *Smith*, 24 S.W.3d at 282 (citation omitted). Accordingly, appellant is not entitled to plain error review of this issue.

## 2. Impeachment of Mr. Swenson

Appellant also takes issue with the State's eliciting testimony that Mr. Swenson, a defense witness, had a sexual battery conviction involving a child under the age of thirteen and that he performed sexual favors for commissary. The State sought to impeach Mr. Swenson's testimony with evidence of his prior conviction. *See* Tenn. R. Evid. 609(a). As previously noted, Rule 609 prohibits the offering of evidence of the facts and circumstances underlying the crime. *Eddie Elveton Robinson Gaston*, 2006 WL 74149, at *25. The State asserts that the fact that the victim was less than thirteen years old was also the basis for the specific statutory form of aggravated sexual battery for which Mr. Swenson was convicted. *See* Tenn. Code Ann. § 39-13-504(a)(4) (2010). Impeachment of Mr. Swenson regarding his prior conviction only required asking if he had such a conviction. The purpose of using a prior conviction to impeach a witness is to attack their character for truthfulness, thus, the specific statutory form for the crime committed is of no consequence. "The theory of such impeachment is that it goes to the credibility of the witness, since one who has committed a crime is more likely to lie than is a person with a spotless record." 10 David Louis Raybin, *Tennessee Practice*: *Criminal Practice & Procedure* § 27:93 (2012-2013 ed.). The State needed only to show that Mr. Swenson had a conviction for aggravated sexual battery to impeach his credibility. Evidence regarding specific statutory form of aggravated sexual battery was unnecessary to establish the fact that he had previously committed a crime. Thus, the trial court's allowing the State to question Mr. Swenson about the age of his victim was improper and breached a clear and unequivocal rule of law.[4]

Appellant also takes issue with the State's questioning Mr. Swenson regarding his performing sexual acts for commissary while incarcerated. At trial, appellant presented the testimony of Mr. Swenson to corroborate his claim of self-defense. Investigator Nadolski, who investigated the incident between the victim and Mr. Swenson, also testified. Before the State questioned Mr. Swenson regarding his performing sexual acts in exchange for

---

[4] We note that appellant failed to lodge a contemporaneous objection at trial.

commissary, the trial court held a jury-out hearing during which Mr. Swenson testified. During this offer of proof, Mr. Swenson denied performing sexual acts for the victim in exchange for commissary. The court ruled that Mr. Swenson could present his testimony. In the same jury-out hearing, Investigator Nadolski testified that his reports indicated Mr. Swenson had performed sexual acts in exchange for commissary.

The State relies on Rule 608 of the Tennessee Rules of Evidence as a basis for admissibility of this evidence:

> Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified.

The State's reliance is misplaced. The hallmark of Rule 608 is that the specific instance of conduct must be probative of truthfulness or untruthfulness. We cannot equate trading sexual favors for commissary with untruthfulness. Tennessee Rule of Evidence 608 does not provide an avenue for admissibility of this evidence. The introduction of this evidence was improper and breached a clear and unequivocal rule of law.

Having concluded the trial court committed error by allowing the State to question Mr. Swenson about the age of this victim and by permitting the State to elicit testimony from Investigator Nadolski concerning Mr. Swenson's trading sexual favors for commissary, this court must now determine if errors require reversal of appellant's conviction. *See* Tenn. R. App. P. 36(b). Pursuant to Rule 36, this court will not set aside a final judgment unless, "considering the whole record, error involv[ing] a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *Id.* The Tennessee Supreme Court has provided guidance on this issue, stating that

> [t]he line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt. Accordingly, when looking to the effect of an error on the trial, we will evaluate that error in light of all of the other proof introduced at trial. The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it

-18-

becomes that an error affirmatively affected the outcome of the trial on its merits.

*State v. Gilliland*, 22 S.W.3d 266, 273-74 (Tenn. 2000) (internal citations and quotations omitted).

There is no question appellant killed the victim. Appellant attempted to assert self-defense. However, the evidence demonstrated that appellant strangled the victim to death and attempted to conceal the murder. Based on the record before us and the strong evidence of appellant's guilt, we cannot say that any error in allowing the State to question Mr. Swenson about the age of his victim "more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b). Neither did the State's eliciting of evidence regarding Mr. Swenson's engaging in sexual acts in exchange for commissary "more probably than not affect[ ] the judgment . . . ." Tenn. R. App. P. 36(b). Thus, these errors did not affect a substantial right of the accused, and consideration of the error is not necessary to do substantial justice. We decline to extend plain error review to these errors.

Upon review, we conclude that with regard to these claims of error, appellant has failed to establish that a substantial right of the accused was adversely affected and that consideration of the errors is necessary to do substantial justice. Thus, because appellant cannot establish all of the *Adkisson* factors for each issue, he is not entitled to relief under plain error review. *Smith*, 24 S.W.3d at 282.

## B. False Testimony

Next, appellant argues that the false testimony of Ms. Futrell violated his due process rights to a fair and impartial trial. Appellant alleges that Ms. Futrell's testimony in which she denied speaking with Nickie Jordan at Internal Affairs and also denied being reprimanded or re-instructed regarding proper protocol as the "false testimony" the State used to convict him. He further claims that Ms. Futrell's in-court testimony regarding incidents that she did not include in her statement to Mr. Jordan was false.

"It is a well established principle of law that the [S]tate's knowing use of false testimony to convict an accused is violative of the right to a fair and impartial trial as embodied in the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, §§ 8 and 9 of the Tennessee Constitution." *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993) (citing *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935); *Hall v. State*, 650 P.2d 893 (Okla. Crim. App. 1982)). The State has an affirmative duty to not present false testimony. *See id.* (citing *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959); *Blanton*

*v. Blackburn*, 494 F.Supp. 895, 900 (M.D. La. 1980), *aff'd*, 654 F.2d 719 (5th Cir. 1981); *Hall v. State*, 650 P.2d at 896)). The State further has a duty to correct false testimony once it realizes that a witness has presented it. *Id.* To obtain a new trial based on false testimony, appellant must show by a preponderance of the evidence that the State presented false testimony, that the State knew the testimony was false, and that the testimony was "material." *See State v. Ricky Alexander Nabors*, No. 02C01-9404-CC-00065, 1994 WL 716247, at *2 (Tenn. Crim. App. Dec. 28, 1994); *State v. Ricky Terrell Cox*, No. W2007-01371-CCA-R3-CD, 2009 WL 416000, at *12 (Tenn. Crim. App. Feb. 19, 2009).

Appellant first takes issue with Ms. Futrell's denying that she spoke with Nickie Jordan from Internal Affairs. Although Ms. Futrell denied specifically speaking with Nickie Jordan, she admitted that she spoke with "some guy" regarding this incident. Ms. Futrell said she was unsure of the person's title or whether the person was with Internal Affairs. Moreover, when presented with a copy of her statement and asked whether it was her statement "that she gave to this guy or Nickie Jordan with Internal Affairs," Ms. Futrell said that it was her statement. Appellant has not met his burden of showing that Ms. Futrell's testimony that she did not speak with someone from Internal Affairs was false or material. Defense counsel questioned Ms. Futrell regarding speaking with someone in Internal Affairs in an attempt to highlight Ms. Futrell's omission of a fact contained in the statement. Ms. Futrell never denied giving her statement and was only unclear about to whom she gave her statement. As the State notes in its brief, Ms. Futrell's testimony that she did not speak with Nickie Jordan in Internal Affairs was "imprecise or incomplete" at worst. "The presentation of inaccurate testimony by a [S]tate's witness does not equate to a showing that the [S]tate knowingly sponsored false testimony." *State v. Charles E. Robinson*, No. M2004-01163-CCA-R3CD, 2005 WL 2008186, at *5 (Tenn. Crim. App. Aug. 17, 2005).

Moreover, assuming *arguendo* that Ms. Futrell's testimony regarding to whom she gave her statement was false, the testimony was not material. "In determining the materiality of the testimony, the inquiry becomes whether a reasonable likelihood exists that the false testimony could have affected the jury's judgment." *Charles E. Robinson*, 2005 WL 2008186, at *4 (citing *Giglio*, 405 U.S. at 154). Ms. Futrell admitted giving the statement in question and identified the statement. Defense counsel cross-examined her about the statement. Considering the fact that she admitted giving the statement and espoused the contents of the statement as her own, no reasonable likelihood exists that Ms. Futrell's mistaken testimony about to whom she gave her statement affected the jury's judgment.

Appellant further alleges that the State presented false testimony when Ms. Futrell testified at trial regarding things that she did not include in her statement to investigators, when she incorrectly stated the inmate counting protocol, and when she said that she did nothing wrong and acted within protocol. However, appellant has not offered any proof

-20-

about how these statements were false. Defense counsel cross-examined Ms. Futrell regarding her statement and the protocol for counting inmates. When witnesses give contradictory testimony, the trier of fact determines which testimony is credible. Appellant has not proven that Ms. Futrell perjured herself by testifying to things that she omitted from her statement to investigators nor has he provided any proof that shows that Ms. Futrell testified falsely concerning the protocol for counting inmates. Moreover, even if Ms. Futrell perjured herself, appellant has not shown that the State knowingly presented the false testimony.

According to appellant, "[t]he most blatant" false testimony occurred when Ms. Futrell denied that she was reprimanded and received additional training in appropriate inmate counting protocol. When asked whether she was "reprimanded or reinstructed on proper count procedures" as a result of this incident, Ms. Futrell answered that she was not. Appellant argues that Ms. Futrell's testimony was contrary to the testimony of Agent England, who stated that the warden informed him that he had verbally reprimanded and talked to each correctional officer. Appellant asserts that either Ms. Futrell or Agent England gave false testimony and that Ms. Futrell had a motive to lie. Appellant fails to recognize, however, that Agent England also testified that whether an employee perceived the warden's talking to them about the incident as a reprimand depended on the tone of voice used and the setting. Therefore, while the warden may have spoken to Ms. Futrell regarding the procedures at the prison, Ms. Futrell may not have understood their conversation to be a reprimand. Regarding Ms. Futrell's receiving additional training, Agent England stated that the warden told him that he was going to implement additional training for all officers. However, Agent England further stated that he did not know whether the warden actually had implemented the additional training. He also agreed that the new procedures applied to everyone, and Ms. Futrell likely would not have considered them an action taken against her only.

Appellant alleges several instances of the State's presenting the false testimony of Ms. Futrell, but he has failed to show by a preponderance of the evidence that the testimony was indeed false or that the State knowingly presented false material evidence. Appellant questioned Ms. Futrell, attempting to impeach her regarding her inconsistent statements. The jury heard the testimony and weighed the credibility of the witnesses. By its verdict, the jury obviously did not find that Ms. Futrell's testimony was not credible or that any inconsistent or false testimony outweighed the other evidence of appellant's guilt. Accordingly, we conclude that appellant is not entitled to relief on this issue.

## C. Prosecutorial Misconduct

Next, appellant claims that the State engaged in prosecutorial misconduct when it made "several[,] often overlapping, plainly inflammatory, improper, prejudicial statements during closing argument" that infringed on appellant's constitutional rights. Specifically, he asserts that during closing arguments, the prosecutor vouched for the credibility of witnesses, intentionally inflamed or prejudiced the jury, gave a message to the community and an "invitation to disregard jury instructions regarding lesser-included offenses," and argued facts outside of the record. The State responds that appellant has waived appellate review of this issue because he failed to include this issue is his motion for new trial. Appellant acknowledges the omission of this issue from the motion for new trial and asks this court to review the issue for plain error.

Prosecutorial misconduct is an issue that appellants must raise in a motion for new trial. *State v. Howard*, No. M2010-00578-CCA-R3-CD, 2011 WL 3480968, at *6 (Tenn. Crim. App. Aug. 9, 2011), *perm. app. denied* (Tenn. Oct. 24, 2011) (citing Tenn. R. App. P. 3(e)). "Thus, if this court is to review the claim of prosecutorial misconduct, we must again do so through the process of "plain error" review embodied in Rule 36(b)." *State v. Robert Fusco*, No. M2010-01724-CCA-R3-CD, 2012 WL 368224, at *9 (Tenn. Crim. App. Feb. 3, 2012), *perm. app. granted*, *cause remanded,* (Tenn. Crim. App. Dec. 6, 2012). "Rule 52(b) [of the Tennessee Rules of Criminal Procedure] leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). Again, we will only consider an issue under plain error review if the error was "of such a great magnitude that it probably changed the outcome of the trial." *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (citing *Adkisson*, 899 S.W.2d at 642).

The record on appeal contains a transcript of closing argument, and the first factor for plain error review is present. Next, we consider whether a clear and unequivocal rule of law was breached. Initially, we note that "argument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Tennessee courts give great latitude to counsel arguing their cases to the jury. *Id*. Thus, "trial judges have wide discretion in controlling the argument of counsel, and their action will not be reviewed absent abuse of that discretion." *Id*. However, the comments of counsel during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *State v. Lewter*, No. M2010-01283-CCA-RM-CD, 2011 WL 1197597, at *4 (Tenn. Crim. App. Mar. 31, 2011) (quoting *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007)).

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). To establish reversible error and succeed on a claim of prosecutorial misconduct, the appellant must show that "the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). When determining whether the argument affected the jury's verdict, we consider the following five factors: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)

> This court has previously recognized five general areas of prosecutorial misconduct:
>
> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
>
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

Here, appellant asserts numerous instances where he believes that the prosecutor vouched for the credibility of the witnesses and expressed his personal beliefs. Specifically,

appellant takes exception to the prosecutor's stating (1) that he had a different recollection of the evidence than opposing counsel; (2) that he found the victim's allegedly asking appellant for sexual favors "disgusting"; (3) that the killing was not self-defense and was unlawful; (4) that appellant's assertion that he put the victim in a headlock was incorrect; (5) that he was "not saying that [appellant] was not in the right place"; (6) that the department of correction staff was not at fault; and (7) that various witnesses' testimonies were not credible.

"Expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment which should separate a lawyer from the cause for which he argues." *Goltz*, 111 S.W.3d at 6-7 (citation omitted). During closing arguments, prosecutors must not interject their personal beliefs or opinions, however, whether a prosecutor's doing so qualifies as misconduct is often dependent upon the specific terminology used. *Gann*, 251 S.W.3d at 460. "For example, argument predicated by the words "I think" or "I submit" does not necessarily indicate an expression of personal opinion." *Id.* (citing *United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978)).

After reviewing the prosecutor's statements about which appellant complains, we conclude that the prosecutor did not insert his personal beliefs or vouch for the credibility of the witnesses during closing argument. The prosecutor attempted to discredit the defense witnesses and expose inconsistencies in their testimonies; however, he did not offer his personal opinion about the witnesses' credibility. It is also noteworthy that during closing argument, defense counsel stated, "[Ms. Futrell] lied in this courtroom. She got up there in front of this jury in this courtroom and lied." We do not see how the prosecutor's suggesting that the State's witnesses were credible and the defense witnesses were incredible is any more egregious than appellant's assertion that Ms. Futrell was untruthful in her testimony.

Appellant also complains that the prosecutor inflamed the jury when he said, "I'm not saying that [appellant] was not in the right place . . . ." "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." *Goltz*, 111 S.W.3d at 6 (citations omitted). However, appellant fails to acknowledge that the prosecutor said this regarding appellant's not having a duty to retreat if attacked. We do not see how this inflamed the jury. If anything, this bolstered appellant's self-defense argument. The prosecutor's statement was not calculated to inflame the jury nor was it improper.

Next, appellant claims that the prosecutor "sent a message to the community" and invited the jury to disregard the court's instructions regarding lesser-included offenses. As stated in a previous opinion of this court,

The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. Predictions as to the consequences of an acquittal on lawlessness in the community also go beyond the scope of the issues in the trial and are to be avoided.

*Id.* at 8. Appellant asserts that the prosecutor's stating to the jury that he remembered things differently than opposing counsel and the prosecutor's stating, "Now, in my opinion, [lesser-included offenses are] just a legal speech for giving the jury an easy way out. . . . [T]o let [appellant] off on anything less than second degree murder is not doing right," violated these principles.

However, nothing about the prosecutor's statements made a prediction about what would happen in the community if the jury acquitted appellant. The prosecutor's arguing that the right thing for the jury to do was to convict appellant was not improper. Further, while trial counsel's comment regarding lesser-included offenses was inappropriate, said error was harmless because the trial court properly instructed the jury regarding lesser-included offenses. We presume that jurors follow the instructions of the trial court. *State v. Cribbs*, 967 S.W.2d 773, 784 (Tenn. 1998); *State v. Laney*, 654 S.W.2d 383, 389 (Tenn. 1983). Therefore, any error in this regard did not affect the outcome of the trial.

Finally, appellant asserts that the prosecutor argued facts outside of the record during closing argument. Specifically, appellant objects to the prosecutor's statement that appellant was serving a ten-year sentence "for an agg[.] robbery, a violent crime, where he either hurt somebody or used a weapon." He further objects to the prosecutor's statement, "But if there's a sexual assault here, if there's an attempt at rape, who was behind who? He was behind Ricky Gardner. Whose pants were down?"

"It is unprofessional for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge. Arguing facts outside the record could involve a risk of serious prejudice." *Goltz*, 111 S.W.3d at 9. Although there are limitations on the scope and tenor of the arguments of counsel, "prosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Banks*, 271 S.W.3d at 131 (citations omitted).

Here, appellant's prior conviction was properly admitted into evidence during the trial. In closing argument, the prosecutor acknowledged the prior conviction and argued the

inference that appellant either used a weapon or hurt someone, which are the two bases for an aggravated robbery conviction. In addition, the evidence showed that the victim's pants were down and that appellant was behind the victim when he killed him. The prosecutor's arguments implicating appellant as the perpetrator of the possible sexual assault were reasonable inferences drawn from the evidence and were not improper.

Appellant has failed to establish that any reversible prosecutorial misconduct occurred and that there was a breach of a clear and unequivocal rule of law. Therefore, plain error relief is not warranted, and we need not proceed with an examination of the remaining *Adkisson* factors. *See Smith*, 24 S.W.3d at 283 ("[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error.") Accordingly, we conclude that appellant is not entitled to relief on this issue.

## D. Sufficiency

It is undisputed that appellant killed the victim. However, appellant contends the evidence was insufficient to convict him because it showed that he acted in self-defense, thus, the killing was not unlawful. He claims that the evidence showed that the victim was the primary aggressor who attacked appellant after appellant refused his sexual advances. The State responds that the evidence was sufficient for the jury to reject appellant's claim of self-defense and find appellant guilty beyond a reasonable doubt of second degree murder. We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and

the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

As indicted in this case, second degree murder is a "knowing killing of another." Tenn. Code Ann. § 39-13-210 (2010).

> "Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id*. § 39-11-106 (2010). Appellant asserted self-defense as an affirmative defense to second degree murder. Pursuant to Tennessee Code Annotated section 39-11-611(b)(2) (2010),

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

*Id*. § 39-11-611 (2010).

Viewed in the light most favorable to the State, there was sufficient evidence presented by which to sustain appellant's conviction of second degree murder. Appellant admittedly killed the victim. The State presented proof that appellant strangled the victim from behind using an arm-bar or choke-hold and that the victim's body showed no other sign of a struggle other than a broken fingernail. Furthermore, Agent England testified that there was no sign of a struggle in the cell shared by appellant; an inmate housed in the next cell testified that he heard no struggle; and corrections officers testified that they heard no indication that appellant tried to summon them for help. The evidence further showed that appellant concealed the murder by telling correction officers that the victim was asleep. He went to eat breakfast after the murder and left the deceased victim in the cell. Appellant posits that he acted in self-defense by subduing the victim when the victim charged at him and hit him on the shoulder after he rejected the victim's request for sexual favors. Appellant's argument raised a question of fact for the jury. By its guilty verdict on the charge of second degree murder, the jury obviously rejected appellant's affirmative defense. Moreover, the jury clearly accredited the testimony of the State's witnesses regarding the incident over appellant's version of events. In doing so, the jury resolved questions of credibility of witnesses and factual disputes raised by the evidence. *See Bland*, 958 S.W.2d at 659. We will not reevaluate the inferences drawn from the evidence by the jury or reweigh the evidence. *See Dorantes*, 331 S.W.3d at 379. Accordingly, we conclude that appellant is not entitled to relief on this issue.

E. Sentencing

Appellant argues that the trial court erred by ordering that he serve his sentence in this case consecutively to his sentence in another case. Specifically, he argues that the trial court did not make appropriate findings necessary to determine that he should serve his sentences consecutively.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b) (Supp. 2012). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (Supp. 2012).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (Supp. 2012), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The determination of whether an offender should be sentenced to consecutive or concurrent sentences is within the sound discretion of the trial court. *State v. Christopher M. Black*, No. M2010-02176-CCA-R3CD, 2011 WL 7562957, at * 5 (Tenn. Crim. App. Dec. 13, 2011), *perm. app. denied* (Tenn. May 16, 2012) (citing *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). *See Bise*, 380 S.W.3d at 708. Tennessee Code Annotated section 40-35-115, in relevant part, permits the trial court to order consecutive sentencing if it finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (Supp. 2012). However, "when a trial court uses the 'dangerous offender' factor, it must also decide whether consecutive sentences (1) reasonably relate to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing." *State v. Alder*, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001) (quoting *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995)).

Here, the trial court found that appellant was a dangerous offender whose behavior indicated little or no regard for human life and that appellant had no hesitation about committing a crime in which the risk to human life was high when ordering consecutive sentences. *See* Tenn. Code Ann. § 40-35-115(b)(4). However, the court focused only on the statutory language of the "dangerous offender" category and did not make the specific findings required by *Wilkerson*.

We agree with the trial court's finding that appellant's behavior indicated little or no regard for human life and that appellant had no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4). The record shows that

appellant choked the victim with his bare hands while incarcerated at a correctional facility. Appellant did so because the victim allegedly hit him on the shoulder and asked him for a sexual favor. The evidence further showed that appellant moved the victim's body because it was "in the way," concealed the murder by telling correction officers that the victim was asleep, and went to eat breakfast after the murder, leaving the deceased victim in the cell. Moreover, despite the trial court's failure to make the requisite *Wilkerson* findings, our review of the record reveals that the aggregate length of the appellant's sentence reasonably relates to the severity of his offenses. Appellant murdered his cellmate while incarcerated for a violent crime. If appellant had no hesitation about committing murder while incarcerated, the public certainly needs to be protected from him. Finally, we conclude that consecutive sentencing in this case is congruent with the principles of sentencing. The record demonstrates that the appellant is a dangerous offender and consecutive sentencing is appropriate. Appellant is not entitled to relief on this issue.

## CONCLUSION

Our review of the record reveals no reversible error in the trial court proceedings. Accordingly, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE